**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**


**NORA LIZETH SAAVEDRA ARANDA,** )
                                        )
                 **Petitioner,** )
                                        )
                                        )
**vs.**                                       )    **CASE NO. 3:12-0311**
                                        )    **JUDGE KNOWLES**
                                        )
                                        )
**ROSENDO ELIZONDO SERNA,**       )
                                        )
                 **Respondent.**       )


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.  Introduction and Background

The Court tried this case with the consent of the parties and without a jury on

October 24-25, 2012.  This action involves a claim brought by Petitioner Nora Lizeth Saavedra

Aranda against Respondent Rosendo Elizondo Serna under a treaty known as the 1980 Hague

Convention on the Civil Aspects of International Child Abduction (the "Convention"), and its

implementing legislation in the United States, the International Child Abduction Remedies Act

("ICARA"), 42 U.S.C. § 11601 *et seq.*  Ms. Saavedra claims that Mr. Elizondo failed to return

the parties' two children to her in Mexico after an approved visitation the children had with Mr.

Elizondo in Franklin, Tennessee.  Pursuant to Fed. R. Civ. P. 52, the Court enters the following

Findings of Fact and Conclusions of Law.

### II.  Findings of Fact

The parties to this action, Ms. Saavedra and Mr. Elizondo, were married in Mexico on

August 5, 1999.  Stipulations, Docket No. 76, p. 1. They moved from Mexico to Franklin,

Tennessee, on December 31, 1999. *Id*. They have two minor children together, who will be referred to herein as J. E. and A. E. *Id*. J. E. was born December 6, 2000, while A. E. was born January 31, 2002. Tr. I, p. 28.[1] Both children were born in Franklin, Tennessee, and both are U.S. citizens. Docket No. 76, p. 1; Ex. 2.

In May 2003, Ms. Saavedra and the children moved from Franklin, Tennessee to Mexico. Mr. Elizondo remained living in Franklin. Docket No. 76, p. 1.

The parties were divorced in Mexico on or about January 31, 2007. *Id*. The parties stipulated to the Mexican Divorce Decree, which gave Petitioner complete physical custody of the minor children, and gave Respondent weekend visitation as long as he resided in Mexico. Ex. 1. The Decree provides that the children were to live with Ms. Saavedra in Nuevo Leon, Mexico. *Id*. The Decree required Mr. Elizondo to return the children to Ms. Saavedra in Neuvo Leon at the conclusion of each of his visits. *Id*. The Divorce Decree provided that Mr. Elizondo was entitled to have the children visit him for a month during summer vacation, after which he was to return them to Ms. Saavedra in Neuvo Leon. *Id*.

On May 21, 2010, Ms. Saavedra signed a document permitting Ms. Anna Maria Garcia to travel with the children to their father's house in the United States for their month-long summer vacation. Ex. 4. Ms. Saavedra was exercising rights of custody under the parties' Divorce Decree at the time they came to the United States to visit Mr. Elizondo in May 2010. Tr. I, p. 99-100. At the time, the children's country of habitual residence was Mexico. Tr. I, p.

---

[1] There are three separate transcript volumes in the record. Docket Nos. 82, 86, 90. Two of those transcript volumes are labeled "Volume I" and dated October 23, 2012. The Court will, therefore, refer to Docket No. 82 as Tr. I; to Docket No. 86 as Tr. II; and to Docket No. 90 as Tr. III.

62-63.

Apparently, the children arrived in Franklin sometime in May 2010, although the date is not clear in the record.  Tr. I, p. 38.  Under the Divorce Decree, Mr. Elizondo had the right to have the children visit for "a month long summer vacation."  Ex. 4.  Thus, the children should have been returned to Ms. Saavedra in June 2010.  Tr. I, p. 76.

Although it is not explained in the record, the parties apparently agreed at some point that the children would be returned by the end of the summer of 2010.  Tr. I, p. 39.  That did not occur, however, apparently in part because they had started school in Franklin and had begun studying English, and in part because A. E. had begun exhibiting unusual behavior.  *Id.,* p. 40; Tr. II, p. 21-22.

Petitioner consented only to the children's visiting with Mr. Elizondo until the end of July 2010.  The parties, however, subsequently agreed that the children would reside with Mr. Elizondo until December 2010.  Tr. I, p. 40.  In December 2010, Ms. Saavedra asked Mr. Elizondo to send the children back.  *Id.*  Mr. Elizondo, however, told her that he would not be returning the minor children to Mexico.  Tr. I, p. 76.

Approximately four months later, in April 2011, Ms. Saavedra went to the Ministry of Foreign Relations in Mexico to seek assistance.  *Id.,* p. 65.  In December 2010, Ms. Saavedra had been unable to begin taking the necessary steps required to obtain return of the children immediately because she was confined to her home and on bed rest until April 2011.  *Id*., p. 66-68.

She completed the documents given to her at the Ministry of Foreign Relations and returned to the Ministry in October 2011, but they asked for additional information.  Tr. I, p. 65.

She finally completed all the paperwork requested by the Ministry in December 2011. *Id*., p. 69.

In December 2011, through the Hague Convention application process, Mr. Elizondo was invited to return the children to Mexico voluntarily, but he refused to do so. Tr. I, p. 68. Ms. Saavedra was told by the Ministry of Foreign Relations that she should wait to receive a list of attorneys from the Ministry who could help her and who would accept her case. *Id*., p. 69. She did not try to find an attorney independently, because the Ministry had told her to wait for the list from them. *Id*., p. 91-92. She received that list in January 2012, and contacted her present counsel in February 2012.

The Petition in the instant case was filed March 29, 2012. Docket No. 1.

While A. E. and J. E. were visiting Respondent during the summer of 2010, Respondent learned that A. E. had been sexually abused in Mexico. Tr. II, p. 21. Respondent told Petitioner that he was going to keep the children "here longer in order to do studies on [A. E.] because we wanted to know why she was banging her head against the wall and why she was biting the carpet." *Id*., p. 22.

In 2009, A. E. was abducted or kidnapped by a man named Marcelino. Tr. I, p. 52. At the time, A.E. was in the custody of her mother in Mexico. Tr. I, p. 82. Marcelino was criminally charged, and A.E. testified against him. *Id*., p. 83. He was given probation for the abduction and attempted rape of A. E. Tr. I, p. 83-84.

Petitioner, however, did not admit that A. E. was sexually assaulted; Petitioner thought only that A.E. was the victim of an attempted sexual assault. Tr. I, p. 80. The record is unclear as to whether Petitioner informed Respondent of the incident, and if so, when she informed him and what she told him about it.

With regard to the incident in Mexico, Petitioner submitted an Exhibit reflecting an assessment of A. E. that occurred in Mexico on August 23, 2009.[2]  Ex. 7.  Exhibit 7 states in relevant part[3]:

> III. – **Background of the case is described by the minor:** "I was with Wendy, we were playing kitchen, there was a dlunkald next to Wendy's house and he wanted to take me into his house, he said sit down here next to me and took me by my hand into his house, it is gleen and has a big bed.  There are toys, he wanted to give me money, his clothes were thlown alound, he touched me hele in the mouth, he is bad, he coveled my mouth with his hand, I was scleaming for my mommie and she didn't heal me.  Wendy's sistel knocked on the dool, the dlunkaald opened and said that I was not thele, he hid me in his house.  Abi got in and found me, I was sad, he had a shilt of the tigels and pants, I, sholts and a kami blouse, he touched me hele [pointing to the calf and knee], hele on my bottom [pointing to her buttocks] from below, it was a night and there was no more light."
>
> IV. – **Observations:** The mother mentions: "I was at the store and she disappeared; she came back crying with the other girl, she says that he grabbed her legs, her bottom and that he covered her mouth.  The girl that helps me, called Abi, found her crying and brought her. [A. E. was playing with the younger sister of Abi, who is called Wendy.]"
>
> . . .
>
> VI.  **Conclusions:** The MINOR [A. E.]
>
> . . .
>
> Emotionally she shows an anxious and fearful affect, derived from the sexual assault mentioned.

---

[2]  Even though the assessment is dated August 23, 2009, Petitioner testified that the incident in Mexico occurred in September 2009.  Tr. II, p. 120.

[3]  In the following "Background" section of Exhibit 7, a number of words contain the letter 'l' where there apparently should be the letter 'r.'  This may be explained by another section of the assessment which refers to "language," and which states "Normal, with difficulty pronouncing some consonants (for example, R and X), nevertheless, her language is understandable."  Ex. 7, eighth unnumbered page.

> There is clinical data of having been a victim of sexual aggression evidenced by an emotional state of anxiety and fear with crying fits; also, her discourse is consistent with the emotional state presented.
>
> It is considered that her testimony is reliable, given that she has a fluent and spontaneous discourse, that is, it is consistent and in accordance with the affect found.
>
> It is considered that she exhibits damage to her psychological integrity, given that she has suffered a situation or stimulation of a sexual nature that is inappropriate for her short age.
>
> Due to this, it is suggested that she receive psychological treatment during a period of eight months with one session per week, with a cost per session of three hundred pesos in private practice.

Ex. 7, ninth and eleventh unnumbered pages.

Both children testified at the trial. They were sworn appropriately, and both testified through an interpreter. They testified in chambers by agreement of the parties, with only the attorneys, the interpreter, the Court, and a Court Reporter, present. Tr. III, p. 1-5. No objections were raised to the competency of either child to testify.

At the time of the trial, A. E. was 10 years old. A. E. was in the 4th Grade at Johnson Elementary School in Franklin. Tr. III, p. 7-8. Her favorite subject was mathematics, and that she got "pretty good grades in math." *Id*., p. 8. She has lots of friends at school. *Id.,* p. 9. She sees her two best friends every day. *Id.* J. E. helps her get ready for school in the morning, while a Nanny cooks her breakfast. *Id.* Her father takes her and J. E. to school, and picks them both up from school. *Id.,* p. 10. After first testifying that she had not been told what to say by her father or her father's attorney, she stated that she would rather stay in Franklin with her father than live in Mexico with her mother. *Id*., p. 11. As to why, she stated, "I'm afraid to stay with my mom." *Id.*

With regard to the sexual assault, she testified as follows:

> Q.  Did anything ever happen in Mexico that involved somebody touching you or anything sexual?
>
> A.  Yes.
>
> Q.  Okay.  What happened?  Or just – tell me – tell me what happened.  And I know it's hard but she tell me what happened.
>
> A.  When my mom and I were in Mexico and I was playing with my little girlfriend, and then a man came over.  He called me over, and then he threw money on the ground.  And then I thought it was for me so I went toward it.  And then the man just started grabbing me.  And so, you know, my girlfriend was there with me, and – and then so she went with her mother.  But then that man grabbed me by the eyes, and I couldn't see anything, then – so we went over to his house, and then he took out the keys, and then he pulled down my pants.  And he also pulled down my under pants.
>
> Q.  Did anything else happen?
>
> A.  I don't remember.
>
> Q.  So you don't remember what happened.  Okay.  And are you afraid to go back to Mexico?
>
> A.  Yes.  I mean, that could happen to me again.

*Id.*, p. 12-13.

At the time of the trial, A. E. was seeing Claudia Avioa-Lopez, a Counselor and Clinical Social Worker, once a week.  *Id.*, p. 14.  She was also taking medication to "keep [her] calm."  *Id.*, p. 14-15.

Since she got to Franklin, she has been going to church.  She goes to church every Sunday.  *Id.*, p. 16.

J. E., who was 11 years old (almost 12) at the time of the trial also testified.  *Id.*, p. 23.  She was in the 6th Grade at Freedom Intermediate School.  *Id.*  She had been there two years.  *Id.*

She was at Franklin Elementary for one year before that.  *Id*., p. 24.  Her favorite class was math, and her favorite teacher was her math teacher, Ms. Goodwin.  *Id*., p. 27.  J. E. has a number of friends at school and in her neighborhood.  *Id.*, p. 24-25, 38-39.

J. E. helps A. E. get up in the morning and helps ger her ready for school.  *Id*., p. 25.  Angelina cooks breakfast and her father takes her to school every morning  *Id*., p. 26.  He also picks her up every afternoon.  *Id*., p. 26.

She said that neither Respondent nor his attorney told her what to say while testifying.  *Id*., p. 29-30.  She stated that she would rather stay with her father than go to Mexico with her mother, because "[i]t's better here."  *Id*., p. 30.  She testified:

> Q.  What ways is it better?  Can you give me some examples?
>
> A.  There isn't so much violence.
>
> Q.  And what else?
>
> A.  And because of what happened to my sister.

*Id.*

She also gave the following testimony:

> Q.  Do you like – what is the topic of conversation when you and your mom are talking [on the telephone] usually?
>
> A.  That we're going to do what she tells us to do, to go back there.
>
> Q.  Okay.  Has she ever called – has she ever called you and on the phone ever told you you are going back to Mexico?
>
> A.  Uh-huh.
>
> Q.  And what happens?  How do you feel when she says that to you?
>
> A.  Sad.

Q. Why do you feel sad?

A. Cause I don't want to go.

*Id.*, p. 32-33.

A. E.'s typical reaction when she talks with her mother is that she becomes angry "with everyone." *Id.,* p. 33. She is so upset because she does not want to go to Mexico. *Id.*

At the time of the trial, J. E. was seeing a therapist, "Ms. Becky." *Id.*, p. 34. Ms. Becky was with Claudia, and Claudia suggested that J. E. see her. *Id.*, p. 34-35. The last time they talked, they discussed her "responsibility toward [A. E.]." *Id.*, p. 35. She felt like she took too much responsibility for A. E. *Id.* When she was in Mexico, she felt like she was taking "primary care" of A. E. *Id.*, p. 35. She does not feel so much responsibility now, because her father takes more care of A. E. *Id.*, p. 35-36.

J. E. goes to church every Sunday at St. Phillips. *Id.*, p. 43. When she was with her mother in Mexico, she did not attend church. *Id.*, p. 43-44.

The foregoing testimony by A. E. and J. E. was essentially uncontradicted.

Mr. Elizondo has lived at the same place in Franklin with the children for a little over two years. Tr. II, p. 5. He rents the house under a verbal arrangement. *Id.* Angelina Leon lives with them and takes care of his daughters. *Id.*, p. 5-6. He does not have an emotional or sexual relationship with Angelina. *Id.*, p. 6. He does not pay her but he provides her room and board for taking care of the children. *Id.*

He works two jobs, one from 8:00 a.m. to 2:00 p.m., the other from 5:00 p.m. to 11:30 or 12:00 p.m. *Id.*, p. 6-7. He has been employed at both places for about 5 years. *Id.*, p. 7. When Mr. Elizondo first applied at his two restaurant jobs, he gave them a false Social Security

number.  *Id.*, p. 9.  On one of the applications, he stated that he could submit documents to prove his legal right to work in the United States, when he could not do so.  Tr. II, p. 50-51.

He may start looking for a bigger house for himself and the children in Franklin, depending upon the outcome of the instant case.  *Id.,* p. 8.  He has no plans to move the children from the Franklin School District.  *Id.*, p. 8-9.

When A. E. and J. E. get up in the morning, they are happy going to school.  *Id.*, p. 11. He attends parent teacher conferences at the childrens' school, and is available to come in for conferences.  *Id.*, p. 11.

When A. E. started school, he had to go to the school because of her behavior.  She would "just throw herself on the floor and then hit the teachers."  *Id.*, p. 12.  Over the last two years, however, her behavior has improved a "hundred percent."  *Id.*, p. 12.

Mr. Elizondo takes her to counseling with Claudia Lopez in Nashville every Tuesday. *Id.,* p. 12-13.  Mr. Elizondo takes the children to church every Sunday, and has done so ever since they came to Franklin.  *Id.,* p. 15.  He takes the children to school every day.  They never ride the bus.  *Id.,* p. 16.  He picks them up from school also.  *Id.*

He has never told the children not to talk to their mother on the telephone.  *Id.*, p. 17.

Mr. Elizondo refused to send his children back to Mexico because of "the problem" that his daughter had.  Tr. II, p. 42-43.  If nothing had happened to his daughter, he would have sent the children back.  *Id.*, p. 46.

According to Mr. Elizondo, J. E. is more mature than most girls her age.  *Id.,* p. 20.

Respondent also presented the testimony of five witnesses, four of whom were teachers of the children in Franklin.  Carrie Williams, who taught English to the children at Franklin

Elementary School, testified as follows with regard to her interactions with A. E. in 2010:

> Well, [A. E.] when I would have to go to get her from another classroom, especially the first very week of school when they were just getting to know them, she would scream, she would refuse to come with me, she would try to run out of the room. Whether it was the classroom or once I got her to my room she would try to leave my room. And she really seemed to have no sense of how to interact with the classroom, honestly.
>
> . . .
>
> I would characterize her as scared to death and defiant and – .

Tr. I, p. 104-05; 102.

On more than one occasion, A. E. was put into a padded classroom. *Id*., p. 106. Ms. Williams further testified:

> I observed her being rude to other children and to the point of yelling at children, other students, not knowing how to play a game with someone, taking away pieces of a game or a puzzle, yelling, and having severe emotional crying fits. Screaming and crying fits would be the things that I most noted.

*Id*., p. 107.

In thirteen years of teaching, Ms. Williams had never encountered a student as disturbed as A. E. *Id.,* p. 109-10. J. E., however, was sweet and shy, diligent in her work and a well-rounded individual who was good with other children and adults. *Id*., p. 103-04.

Claudia Avioa Lopez, a "Master's Clinical Social Worker," testified at the trial. Docket No. 82, p. 117. A. E. was referred to her through the Franklin School System because she was abused when she was in Mexico. *Id*., p. 119. According to Ms. Lopez, A. E. had evidence of trauma and was having hallucinations. *Id.,* p. 120. A. E. would scream and cry, saying things like "he's there, he's going to get me, he's there." *Id.,* p. 120. A. E. "would get upset a lot because she remembered and she reported that she had been sexually abused, and she would talk

about it and start crying." *Id.*, p. 121.

Ms. Lopez had been seeing A. E. for over 2 years, and A. E. had made significant process. She had had about 86 sessions with A. E.  *Id.*, p. 123.   Her father would bring her to Nashville for the sessions from Franklin.  *Id.*, p. 123.

A. E. would have "some behavior problems" after she talked with her mother.  *Id.*, p. 121-22.

At some point, near the end of 2011, A. E. approached Ms. Lopez stating that she wanted to tell her father the story of what had happened to her.  *Id.*, p. 124-25.

Ms. Lopez stated that A. E. would continue treatment until "she can be able to deal with her emotions."  *Id.*, p. 133.

Karen Hunter-Mennega, an "English language learning" teacher also testified.  Tr. III, p. 63.  Both A. E. and J. E. were her students at Franklin Elementary School.  She recalled the first day she met A. E.,  A. E. was having a fit and screaming and terrified.  *Id.,* p. 65.  With regard to unusual behavior as exhibited by A. E., she testified:

> She would go to the bathroom or – she would be terrified if she
> was – she would be walking down the hall by herself to go to the
> bathroom or something like that, and she would just think someone
> was in there.  It was like she was hallucinating.
>
> And she was really terrified and her eyes would get really really
> dark and she would start screaming for them to go away.  And no
> one was in there.  I was called upon to go tin [*sic*] the bathroom
> and help her.
>
> And then we would go into the principal's office so that it
> wouldn't disrupt the classes to have her screaming.  We tried to
> calm her down.

*Id.*, p. 67.

In 11 years of teaching, she has never seen anything like that before. *Id.,* p. 67-68.

She further testified:

> The first day she was screaming like that and I had not even met
> her yet. I said, it's okay, you can – you know you can tell me or
> you can – it's okay, you're safe here. Nobody's here to hurt you.
> She started telling me immediately about being sexually assaulted.

*Id.,* p. 68.

A. E. would sometimes try to hurt herself or do something inappropriate with school supplies or draw all over her body with markers. *Id.*, p. 74-75. A.E. was also afraid of change in the classroom. *Id.*, p. 79. A. E. was so emotionally tortured about what had happened to her in Mexico that Ms. Hunter-Mennega believed her. *Id.*, p. 82.

Ms. Hunter-Mennega characterized J. E. as a very good student, very cooperative, who acted like a mother and a care giver to A. E. *Id.,* p. 70. J. E. was an excellent student. *Id.*, p. 71. She did not speak English when she first came but she became a very good English speaker and did really well in school. *Id.*

The last time Ms. Hunter-Mennega saw A. E., in May 2011, she was doing really well. A. E. had a party that was designed to share with the guests how well she was doing in reading and math. *Id.,* p. 75.

Respondent always came to every meeting school officials asked him to come to. He was a very loving, very supportive, and very concerned father. *Id.*, p. 78-79.

Sandra Wooten testified at the trial. Tr. p. 91. She was a teacher at Franklin Elementary School. She has a Masters Degree in Education. *Id.,* p. 92. When A. E. first came to her, it was really difficult. A. E. would scream and be very upset, and cry a lot in class. *Id.*, p. 93. At one point, A. E. picked up a brick at recess and started walking over to another child. A. E. stated

that she wanted to hit him with it.  A. E. would throw sand in the eyes of students, would throw

rocks at them, and would kick and punch them.  *Id*., p. 94.

Susan Surbaugh, a teacher in the Franklin Special School District, also testified at trial.

*Id*., p. 107.  She is a Behavior Intervention Specialist, and has been a teacher for 28 years.  *Id*., p.

107.  She has a Bachelors Degree in Special Education and a Masters Degree in Special

Education.  In her Masters Degree work, she specialized in emotionally disturbed students and

behavior problems.  *Id*., p. 107-08.  Most of the time she teaches students in a one-on-one

setting.  *Id*., p. 110.  She testified in part, with regard to A. E.:

> [A] lot of times she becomes emotional.  I think she's still got a lot
> of effects from things that have happened to her in the past.  We
> will work through those things.

*Id.,* p. 111.

She tries to keep A.E.'s schedule very structured so that she knows what's going to

happen, which keeps her calm and makes her feel safer.  *Id.*

With regard to A.E.'s more recent behavior she testified:

> I've had her for a year.  Yeah, a year.  She is, I would say,
> cooperative, 95, 96, 97 percent of the time.  She is uncooperative a
> much smaller percentage of the day than she had been before.
>
> She works hard.  She is finally blossomed to wanting to learn
> being – taking pride in academics and getting things done.  She has
> some problems with other children.  It's not aggression or she
> doesn't have fights or any of that, but she – she has trouble relating
> to children of her own age.  She has some friends, but not a lot. . . .
> She's a delightful girl.  She's happy most of the school day.  Every
> once in a while she will kind of revert to things that seem to bother
> her for no apparent reason, but that's when she's able to talk.  She
> talks to me much more than she used to.  Telling me what's
> bothering her, a bad dream she had the night before or something
> like that.
>
> So she's – she has made a lot of progress in the last year.  I don't

14

know if this is okay to just – some of the testing that we did, we
had our annual IEP just last week. Dad was there, and many of her
scores came up way more than you would expect. She's – she's
doing well. She's progressing . . .

However, [A. E.] does like to keep busy, and at the end of last
school year, I put together a fairly hefty notebook of assignments
for [her] to do over the summer. There was – there were stories to
read, math problems, you know, just typical things that any child
would do to keep up skills.

And frankly, I was extremely surprised that when she came back in
the fall – August, she brought the notebook with her and almost
every single assignment, I'm going to guess there were a hundred
pages of assignments to do, telling time, what not, and in the back
was a lot of stories to read. And she came back and she had done
every bit of it and that was incredibly – that was very different
than most children. *Id*., p. 112-114.

A. E.'s level of work on the summer notebook had never happened in 28 years before.

*Id.,* p. 114.

The testimony of Ms. Williams, Ms. Lopez, Ms. Hunter-Mennega, Ms. Wooten, and Ms.

Surbaugh with regard to A. E.'s behavior when she came to Franklin in 2010 and her

improvement was uncontradicted.

Bobby Lambert also testified at trial. He runs the restaurant where Mr. Elizondo works.

*Id*., p. 54-55. Mr. Elizondo has worked with him for 4 years and has "never missed a shift." *Id*.,

p. 56. Mr. Elizondo is receptive to anything ask of him at work. *Id*., p. 57. Mr. Lambert would

characterize Mr. Elizondo as a "10" on a dependability scale. Mr. Lambert considers himself

lucky to have Mr. Elizondo as an employee. *Id*., p. 59. Mr. Elizondo's employment is "pretty

secure," and he is a hard worker. *Id*., p. 61.

### III.  Conclusions of Law

As discussed above, this case involves the Hague Convention on the Civil Aspects of

International Child Abduction and the International Child Abduction Remedies Act. The U. S. and Mexico are signatories to the Convention. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 11603(a). The U. S. Court of Appeals for the Sixth Circuit has stated as follows with regard to the Convention and ICARA:

> [ICARA] is a codification of the Hague Convention . . . , T.I.A.S. No. 11670, 1343 U.N.T.S. 89 . . . .
>
> The Hague Convention was adopted by the signatory nations to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access. Hague Convention, pmbl.
>
> Under the ICARA, a petitioner must establish by a preponderance of the evidence that his children were wrongfully removed or retained in breach of his custody rights under the laws of the Contract in State in which the children habitually resided before they were removed or retained. . . . Once wrongful removal is shown, the children must be returned. . . . However, a court is not bound to order the return of the children if the respondents establish certain exceptions under the treaty. . . .

*March v. Levine,* 249 F.3d 462, 465-66 (6th Cir. 2001).

In order to establish a prima facie case for the return of the children, Petitioner must show that they have been wrongfully removed to, or retained in, a contracting state in violation of the rights of custody of any person, institution, or other body. Convention Articles 1, 3. The Convention defines a "wrongful removal or retention" as: (1) a breach of the rights of custody according to the law of the country where the child was habitually resident; and (2) where these "rights of custody" were actually being exercised, or would have been exercised but for the wrongful removal or retention. *Id.*, Article 3(b). The determination of "custody rights" is to be made according to the law of the state where the child was habitually resident immediately

before the wrongful removal or retention.  *Id*., Article 3(a).  Children are defined as persons under sixteen (16) years of age.  *Id.*

There is no question that Petitioner has established a prima facie case for the return of the children.

The Convention provides five (or six) defenses to an action for the return of a child.  The defenses are not set forth in a logical manner in the Convention, and they are subject to different burdens of proof.  Three defenses are subject to proof by a preponderance of the evidence:

> (1)  The person making the request for return of the child has delayed more than one year since the wrongful removal or retention, and the child is "now settled" in its new environment (Convention Article 12);
>
> (2) The person, institution, or other body having the care of the child was not actually exercising custody rights at the time of removal or retention (*Id*., Article 13(a)); and
>
> (3) The person, institution, or other body having the care of the child consented to, or subsequently acquiesced in, the removal or retention (*Id*., Article 13(a)).

The following two defenses are subject to proof by clear and convincing evidence:

> (4) The return of the child would expose the child to a grave risk of physical or psychological harm or otherwise place the child in an intolerable situation (*Id*., Article 13(b)); and
>
> (5) The return of the child would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms (*Id*., Article 20)).

Additionally, Article 13 contains an unnumbered paragraph that provides:

> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and as attained an age and degree of maturity at which it is appropriate to take account of its views.

This provision is sometimes referred to as the "mature child's objection," and there is some debate as to whether it is properly labeled a defense.  *See* **The 1980 Hague Convention on the Civil Aspects of International Child Abduction, A Guide for Judges (Federal Judicial Center 2012),** p. 63-64 (hereinafter referred to as "Judges Guide").  It is clear, however, that the mature child's objection is subject to proof by a preponderance of the evidence.  42 U.S.C. § 11603(e)(2(B).

Article 12 generally provides that where a child has been wrongfully retained and, at the date of the commencement of the proceedings before the judicial authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful retention, the authority concerned shall order the return of the child forthwith.  Importantly, Article 12 also provides:

> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Article 13(b) of the Convention provides:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that –
> . . .
>
> (b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Article 20 provides:

> The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental

principles of the requested State relating to the protection of
human rights and fundamental freedoms.

As discussed above, a Court may also refuse a Petition for the return of a child if the

child objects to return, and, based upon the age and maturity of the child, the Court determines it

is appropriate to consider the child's views.

In the case at bar, the Court is concerned with defenses 1 and 4 above, and the "mature

child's objection."  Docket No. 85.  The Court will discuss these below.

ICARA sets forth certain procedural requirements for proceedings under the Convention

for the return of a child.  It provides in relevant part:

> (b) Petitions
>
> Any person seeking to initiate judicial proceedings under the
> Convention for the return of a child . . . may do so by commencing
> a civil action by filing a petition for the relief sought in any court
> which has jurisdiction of such action and which is authorized to
> exercise its jurisdiction in the place where the child is located at
> the time the petition is filed.
> . . .
>
> (d) Determination of case
>
> The court in which an action is brought under subsection (b) of this
> section shall decide the case in accordance with the Convention.
>
> (e) Burdens of proof
>
> . . .
>
> (2) In the case of an action for the return of a child, a respondent
> who opposes the return of the child has the burden of
> establishing –
>
>> (A) By clear and convincing evidence that one of
>> the exceptions set forth in article 13b or 20 of the
>> Convention applies; and
>>
>> (B) By a preponderance of the evidence that any
>> other exception set forth in article 12 or 13 of the

Convention applies.

Respondent's first argument is that the affirmative defense set forth in Article 12 (one year/now settled) has been shown by a preponderance of the evidence. By her own testimony, Ms. Saavedra knew in December 2010 that Mr. Elizondo would not return the children to Mexico. The Petition in this case was not filed until March 19, 2012, more than a year later. As Petitioner admits, she "has not met the strict requirements of the one-year rule . . . ." Docket No. 84, p. 6. She argues, however, that she was "not sitting on her rights" and that the one year period is subject to equitable tolling. *Id.*

While the Sixth Circuit has not spoken to whether the one year period is subject to equitable tolling, Petitioner cites cases from other circuits that have adopted equitable tolling. *See Dietz v. Dietz,* 349 F. App'x 930, 932-33 (5th Cir. 2009) (Summary Order); *Duarte v. Bardalas,* 526 F.3d 563, 569-70 (9th Cir. 2009); *Furnes v. Reeves,* 362 F.2d 702, 723-24 (11th Cir. 2004). These cases, however, involve situations in which the respondent was guilty of some wrongdoing beyond simply refusing to return the children. In *Dietz*, the Court equitably tolled the statute's application because the mother was unable to locate the children after the father abducted them. In *Duarte*, the Court noted that equitable tolling might apply if the "abducting parent took steps to conceal the whereabouts of the child . . . and such concealment delayed the filing of the petition for return." 526 F.3d at 570. In *Furnes*, the Court noted that equitable tolling might apply when the parent removing the child had "secreted" the child. The case at bar does not involve any such conduct.

To the extent that they approve the concept of equitable tolling, however, the Court disagrees with these cases. The Court instead adopts the reasoning set forth in *Lozano v.*

*Alverez*, 697 F.3d 41 (2nd Cir. 2012).

The *Lozano* Court cogently set forth three reasons why equitable tolling is not applicable. First and second, the idea of equitable tolling is contrary to the text of the Convention and it is contrary to the history and purpose of the "now settled" exception. The *Lozano* Court also found it significant that the U.S. Department of State, which was allowed to file an amicus brief in the case before the Second Circuit, recommended that the Court find that equitable tolling does not apply to the one year period under Article 12. The *Lozano* Court noted that the executive branch's interpretation of the Convention, which is a treaty, "is entitled to great weight." 697 F.3d at 50 (citations omitted). Petitioner's argument concerning equitable tolling is unpersuasive.

The next question under this defense is whether the children have become settled in their new environment.[4] As one Court has stated, in order for this provision to be applicable, "there must . . . be evidence that the [child is] in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects." *In re Robinson,* 938 F. Supp. 1339, 1345 (D. Colo. 1997).

The Sixth Circuit has not adopted a test for whether children are "now settled" for Article 12 purposes. Thus, the Court will look to the factors set forth in the frequently cited case of *In re Koc*, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001). In *Koc*, the Court listed the following factors for consideration:

---

[4] Petitioner refers to this defense as the "well-settled" defense. The plain language of the Convention, however, refers to whether the child is "now settled," not "well-settled," in its new environment.

(1) The age of the child;

(2) The stability of the child's residence in the new environment;

(3) Whether the child attends church regularly;

(4) The stability of the [Respondent's] employment; and

(5) Whether the child has friends and relatives in the area.

In the case at bar, A. E. and J. E. have made numerous friends in Franklin, have strong bonds with their teachers, and have made significant progress in their educations. Both speak English and both attend church every Sunday with their father. They have lived in the same residence for more than two years. Mr. Elizondo has worked two jobs for 5 years and his employment is stable. He is a model employee according to his boss.

Petitioner argues that the children are not settled in part because of Mr. Elizondo's immigration status. The *Lozano* Court, considering whether the child in that case was settled, discussed the fact that neither the mother nor the child were legally residing in the United States. *Id*., p. 48. The Second Circuit noted with approval the district judge's consideration of this factor:

> With respect to the final factor, Judge Karas rejected Lozano's argument that the child could not be settled (as a matter of law) so long as she lacked lawful immigration status. Instead, he stressed that "there is nothing to suggest that, at this moment, or in the near future, the immigration status of the child and Respondent is likely to upset the stability of the child's life here in New York."

697 F.2d at 48 (citation omitted).

Once again, the Court agrees with this reasoning and, therefore, discounts the immigration status of Mr. Elizondo.

In summary, the Court concludes by a preponderance of the evidence that Petitioner

delayed more than one year since the wrongful retention and that both children are now settled in their new environment.  The children's return to Mexico would be disruptive with likely harmful effects.  Respondent, therefore, prevails upon this affirmative defense.

Respondent has also raised the "mature child's objection" set forth in Article 13.  That objection is also subject to proof by a preponderance of the evidence.

Petitioner admitted that, even when J. E. was living with her, she was more mature than most girls her age.  Mr. Elizondo agreed with this assessment.  J. E.'s maturity is further shown by her concern for A. E., and her "taking care" of
A. E.

J. E. was 11 years old, almost 12, at the time of the trial.  The Court had the opportunity to observe J. E. closely while she was testifying, and concludes that she has attained an age and degree of maturity at which it is appropriate to take account of her views.

With regard A. E., who was 10 years old at the time of the trial, the Court had the opportunity to observe her closely during her testimony.  She calmly explained the incident that had occurred in Mexico.  She has made significant progress in her behavior and in her school subjects since she came to Franklin in 2010.  Additionally, as Ms. Lopez testified, at approximately the end of 2011, A. E. approached her stating that she wanted to tell her father the story of what had had happened to her.  This very significant fact evinces A. E.'s maturity.  Her maturity is further shown by her work on Ms. Surbaugh's "summer notebook" project.

Petitioner also argues that if she can show the children's preference has been "unduly influenced" by Respondent, then the Court can give less weight to the preferences expressed by the children.  For this proposition, Petitioner cites a case from the Third Circuit, and the Court is

unaware of any controlling authority from the Sixth Circuit. Petitioner introduced proof concerning telephone calls made between Petitioner and the children. Petitioner essentially complained that Respondent does not always answer the telephone when she calls. Obviously, this can be explained in many ways other than that Respondent did not want the children to talk to Petitioner. As discussed above, Respondent works two jobs.

Petitioner further argued that Respondent was unduly influencing the children because he did not coordinate a visit between them and their mother when she was in Tennessee for the trial. In fact, Mr. Elizondo testified as follows:

> Q. Since Ms. Saavedra has been in the United States to attend this trial, you have not coordinated a visit for the girls with their mother, have you?
>
> A. Well, yes, yesterday I asked the girls if they wanted to greet her, and they said no.

Tr. II, p. 38.

The Court concludes, by a preponderance of the evidence, that both children are of an appropriate age and degree of maturity that their views should be considered.

Both children testified that they would rather stay in the United States with their father than go back to Mexico with their mother. Both children also testified that their father had not told them how they should testify. Thus, Respondent has proven the "mature child's objection."

Petitioner further argues that, even if the children are settled, and even if Respondent has asserted a successful affirmative defense, the Court still has the power to return them to Mexico under Article 18, which provides "The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time." In a related argument, Petitioner contends that, even if an affirmative defense is shown, the Court has the

24

discretion to return the children to Mexico if returning them would further the aims of the

Convention. *Friedrich v. Friedrich,* 78 F.3d 1060, 1067 (6th Cir. 1986) (citations omitted).

As one authority has stated:

> Although it appears that Article 18 confers discretion to order a
> child returned regardless of which defense is proven, courts around
> the world have interpreted the breadth of this discretion in different
> ways. Some foreign courts have pointed out that this discretion
> may not exist with regard to the defense described in Article 12
> (Delay plus settlement of the child). Decisions in the United
> Kingdom in Australia have focused on the language differences
> between Article 12 (Delay), Article 13 (Exercise of Custody
> Rights of Grave Risk), and Article 20 (Human Rights Violations).
> Those differences appear to imply that if an Article 12 defense is
> established, denying return may be mandatory. However, is a
> Article 13 or Article 20 defense is established, the Convention's
> language seems to indicate that return is discretionary.

Judge's Guide, p. 65. *See also, Re M And Other (Children) (Abduction: Rights of Custody)*,
[2008] 1 A.C. 1288 (H. L.) (app. taken from Eng. (U.K)).

Even assuming that the Court has discretion or authority under Article 18 or otherwise to

order the return of the children to Mexico despite Respondent's prevailing upon two affirmative

defenses, the Court declines to do so. This is not a case in which Respondent kidnapped his

children and hid them from their mother. They came to Franklin on an authorized visit. While

they were there, Respondent discovered that A. E. had significant behavior problems, and he

learned of her sexual assault in Mexico in 2009. He put the children into school in

approximately August 2010, with the agreement of Petitioner. He arranged treatment for A. E.,

and J. E. also received treatment. Under these circumstances, the Court declines to order the

return of the children to Mexico.

Respondent also has raised the "grave risk" affirmative defense set forth in Article 13 and

quoted above. Unlike the defenses previously discussed, the "grave risk" defense must be

proven by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). The Court must interpret this exception narrowly. *Simcox v. Simcox*, 511 F.3d 594, 605 (6th Cir. 2007) (citation omitted). Respondent must show the return of the child poses a risk that is grave, not merely serious. *Id*. at 605. As did the district court in *Lozano*, the Court concludes that there is insufficient evidence in the case at bar that merely returning to Mexico, even given that that country was the site of some of A.E.'s trauma, in and of itself would present a "grave risk" to either child. The Court, therefore, rejects the "grave risk" defense.

For the foregoing reasons, the Court concludes that Respondent has prevailed upon two of the affirmative defenses, and otherwise sees no reason to send the children back to Mexico. Therefore, a judgment will be entered in favor of Respondent and the Petition will be dismissed. An appropriate Order will be entered.

_____
E. Clifton Knowles
United States Magistrate Judge